CHARLES L. BENNETT v. E. W. BACKUS LUMBER COMPANY.

June 30, 1899.

Nos. 11,662—(202).

### Personal Injury—Sawmill—Negligence—Excessive Damages.

In an action for personal injuries, *held*, that the verdict to the effect that the defendant was and the plaintiff was not guilty of negligence is sustained, but *held*, further (Start, C. J., dissenting), that the award of damages is excessive, and not sustained by the evidence.

### Challenge for Actual Bias—Appeal.

*Held*, following Perry v. Miller, 61 Minn. 412, that, where the court acts as a trior of a challenge to a juror for actual bias, its decision cannot be reviewed on appeal.

**G. S. 1894, § 5659—Cross-Examination of Superintendent.**

> G. S. 1894, § 5659, providing that certain officers or agents of a corporation may be called for cross-examination, construed, and *held*, that any officer, agent, or superintendent having the actual supervision or control of the work or act of the corporation involved in the case may be so called and examined, whether his rank be that of a general officer or not.

Action in the district court for Hennepin county to recover $5,373 damages for personal injuries. The case was tried before McGee, J., and a jury, which rendered a verdict in favor of plaintiff for $2,000; and from an order denying a motion for a new trial, defendant appealed. Affirmed on condition.

*Koon, Whelan & Bennett,* for appellant.

*Geo. B. Leonard, R. B. Stalder* and *Stiles & Stiles,* for respondent.

START, C. J.

The plaintiff was injured on September 13, 1898, while working for the defendant in its sawmill at Minneapolis, and brought this action for the damages sustained, on the ground of the defendant's negligence. The cause was tried January 26, 1899. Verdict for the plaintiff for $2,000, and the defendant appealed from an order denying its motion for a new trial. The principal questions raised by the assignments of error relate to the sufficiency of the evidence to support the verdict as to the negligence of the defendant, the contributory negligence of the plaintiff, and the award of damages.

1. There is no controversy as to how the accident whereby the plaintiff was injured occurred, but as to the alleged negligence of the defendant in the premises the evidence is radically conflicting. There were in operation in the defendant's mill at the time three sets of rollers set in three wooden cases or tables standing end to end, so as to make, when operated at the same time, a continuous table and passageway about three and one-half feet high and three feet wide for lumber from the band saw at the north end of the mill to the outside of the mill on the south. The rollers were about three feet six inches apart, and each projected above the surface of the table about three-eighths of an inch. The first set of rollers was next to the band saw, and extended therefrom towards the south about 32 feet. The next set joined this, and extended still further south about 60 or 70 feet, and the third set extended thence

about 40 or 50 feet to the south end of the mill. These sets of rollers moved at different rates of speed, and were so adjusted that each set could be stopped without stopping the others. The set of rollers next the band saw was seldom stopped, while the others were stopped as occasion required to remove lumber, or cut it, or for other purposes.

A short time before the accident occurred, a log designated as a "snag," which had broken in the woods, came up from the river to the band saw, and was found to be too short to be sawed into lumber, and was sent along the rollers, and, when it reached a point on the second set of rollers about 14 to 16 feet from the end of such set furthest from the band saw, it fell upon the floor of the mill. After it fell off, the second set of rollers was stopped, and the superintendent of the mill called five or six men, among whom was the plaintiff, who were working in the vicinity, to assist in putting the snag back upon the rollers. This was done, and the snag was placed upon the second set of rollers at a point near the lower end thereof. The plaintiff had worked in and about sawmills in various capacities for many years, and was familiar with their operation, but had worked in this mill only some 12 days prior to the accident, and was not aware that there were more than two sets of rollers. He supposed that the first and second sets formed one section of the table. After the log had been replaced on the rollers, the plaintiff got upon the table and took hold of the end of the log towards the saw, with his back to the saw, for the purpose of holding the log on the table. This position was one of comparative safety if a set of rollers between him and the saw were kept stationary, but one of positive danger if all of the rollers back of him were kept running.

The plaintiff testified that he was directed by the superintendent of the mill, Mr. Flanagan, to assume the position he did; that he refused to do so, unless the rollers behind him were stopped and kept so while he was on the table; and that the superintendent told him that he would do so. The plaintiff further testified that, relying on the promise of the superintendent, he got upon the table near the junction of the second and third sets of rollers, and took hold of the log, and after it had gone over on to the third set, and

while he was guiding the log in a stooping position, with his back to the band saw, the rollers of the section behind him were started without his knowledge, but with the knowledge of Mr. Flanagan, and a 4x12 plank, 20 feet in length, came over the second section and upon the third, and struck him on his left foot at the ankle joint, driving the ankle and foot against the log. The plaintiff on his cross-examination, as to his conversation with the superintendent, testified as follows:

"Q. What were the words he used? A. He said, 'Get up there and hold that log.' I said, 'I won't do it until you stop those rollers, and keep them stopped.' Q. Which rollers? A. The live rollers from the band. Q. Do you mean the first set? A. Yes, sir. I said, 'This plank is coming down onto me,' after they had sawed it. Q. You said that you wouldn't do it. Were those the words that you used? A. Yes, sir. Q. Just tell me the words that you used to him. A. I told him that I wouldn't get up there until he stopped those rollers and kept them stopped, and he said he would, and he caused them to be stopped."

The superintendent testified that he did not direct the plaintiff to get upon the table and hold the log, and that no such conversation as claimed by him occurred, but that, on the contrary, he directed two of the men to get on each side of the roller case and steady the log, and that when he saw that the plaintiff was upon the roller case, holding the log, he told him to get down and stand by the side of it. He also testified that the first set of rollers was running while the log was being placed on the case, and were not stopped at any time until the plaintiff was hurt. The superintendent was corroborated more or less directly by other employees, —six in all,—who were working at or near the case at the time.

It is claimed by the defendant that the testimony of the plaintiff was so inherently improbable, and the verdict so manifestly against the great weight of the evidence, that it was an abuse of discretion on the part of the trial court not to grant a new trial. If the superintendent did, in fact, direct the plaintiff to get upon the table or roller case, and steady the log in that position, there would seem to be nothing unreasonable in the plaintiff's declining to do so, unless he had assurances that a set of rollers behind him were to remain stationary while he was executing the order; for, from his

experience as a workman in and about sawmills, he must have appreciated the danger of the position if all of the rollers back of him continued to run. It must, however, be admitted that it seems somewhat unreasonable to believe that the superintendent would give such an order, or that the conditional refusal of the plaintiff was couched in the formal and defiant language he claims to have used. On the other hand, it is difficult to understand why the plaintiff should have been so idiotic as to place himself in this position of danger on his own motion, without any assurance that the rollers behind him would be stopped, and remain there after being ordered away by the superintendent. He was an experienced man of mature years, and his conduct is inexplicable, except upon the hypothesis that he was ordered to the place, and complied on the assurance that he would be protected. But it is not our purpose to state in full or to discuss the evidence.

Our conclusion, based upon the whole record, is that the verdict, the question of damages aside, is not so manifestly and palpably against the weight of the evidence as to justify us in holding that the trial court abused its discretion in refusing to grant a new trial. Assuming, as the jury have found, that the plaintiff's version as to the order, promise, and action of the superintendent is correct, the defendant was guilty of negligence. There was no material variance between the negligence alleged in the complaint and that which the plaintiff's evidence tended to prove. The question of the plaintiff's alleged contributory negligence is inseparably connected with that of the defendant's negligence; for, if the plaintiff placed himself in the position he did by the direction of the superintendent, and in reliance upon his assurance of protection, he was not negligent, as a matter of law. We hold the verdict is sustained by the evidence as to the question of the plaintiff's contributory negligence and as to the defendant's negligence.

2. The defendant further claims that the damages are so excessive as to indicate that they were awarded as the result of prejudice.

The plaintiff's ankle was sprained as a result of the plank striking his ankle joint. A sprained ankle may or may not be a serious injury. In some cases the injury resulting from such a sprain is

more serious than a broken leg, while in others it is comparatively slight. The amount of damages which ought to be awarded for such an injury must depend upon the facts of each particular case. Thus, in the case of Christian v. City of Minneapolis, 69 Minn. 530, 72 N. W. 815, it was held that an award of $3,000 damages was not excessive for a sprained ankle. But in that case the trial was had two years after the injury, and the plaintiff had not then recovered, and the fair probability was that she never would fully recover from the injury. That case is clearly distinguishable from this one.

The opinions expressed by the medical experts as to the extent of the plaintiff's injury and the probability of his complete recovery were conflicting. The surgeons called by the plaintiff expressed a more or less positive opinion that the ligaments and a nerve of the ankle were injured. One of them on his cross-examination testified as to the injury to the ligaments and nerve as follows:

"Q. I suppose then. doctor, that we may say that between October 25 and the time when you recently examined him that the thickening around that joint had disappeared? A. To a great extent. Inflammation subsided. The effusion was absorbed out of the joint. The effusion in the tendon was absorbed. Q. And that originally there were no fractures? A. Not on that foot as far as I could discover. Q. And what do you say about any tendons being broken? A. No tendons broken as far as I could discover. Q. Any ligaments? A. That is a question that I am not prepared to answer. If the effusion in that joint was caused by traumatism, which I have reason to infer that it was, I don't think there is any question but what the ligaments in the ankle joint had been injured. Q. But you would not care to say how much? A. I would not say how much; nobody can say. * * * Q. I understand you to say that you did not claim that that nerve inflammation existed now, but it had existed? A. It does not exist at the present time to a marked degree, but it has existed, and now we have simply the results of the inflammation of that nerve,—paralysis of the nerve and loss of sensation. * * * Q. Do you think that inflammation in this nerve was caused by this injury down there on the side of the foot? A. I do; probably indirectly; directly or indirectly. Q. Your opinion is that it was not in any way, except indirectly? A. I said probably indirectly, but it can be directly; but probably indirectly in this case,—the same thing."

Another of the plaintiff's experts expressed the positive opinion that the plaintiff was suffering at the time of the trial from neuritis

or inflammation of the nerve, caused by a blow, and that if it continued the leg would finally become useless; but whether it would continue or not he was not prepared to say, and that, in his judgment, it was a little problematical. The last surgeon called by the plaintiff gave it as his opinion that he was suffering from neuritis, and gave his opinion as to the probability of his recovery in these words:

"I would not state the probability. It is four and a half months since the accident. I know what the present condition is. From that present condition it must at least take a long time before it is restored. It may remain as bad as it is at present, or may grow worse."

The defendant called two surgeons. The first one testified that he examined the plaintiff's foot on the day of the accident, and found no external marks of injury, and that he made a further examination the latter part of October, and could find nothing wrong with the foot. The other surgeon, who examined the plaintiff at the time last stated, testified as follows:

"I looked the foot over carefully; also compared it with the other foot, and I was not able to make out any difference between the two feet. There was a slight difference between the size of the two legs; but, as has already been stated, that, in my opinion, was due to the bandaging. The foot had been bandaged, and I thought that its being smaller was due to the pressure of the bandage. Outside of that I couldn't notice any difference between the two feet. * * * Q. Any evidence of broken bones? A. None whatever. Q. Any evidence of ruptured ligaments? A. None that I could see. Q. Any evidence of diseased nerves? A. I could not make out anything of the kind. He said nothing about pain which would be indicative of diseased nerves. * * * Q. Then, what did you find the trouble with his foot as far as you could see? A. I didn't see anything wrong with the foot at all."

If we turn from these conflicting opinions and speculations of the learned experts, and consider the admitted physical facts of the case from the standpoint of common sense, it is reasonably clear that the plaintiff's injury is not permanent, and that the case is one of an ordinary sprained ankle. The plaintiff himself testified that he laid aside his crutches about a month after the accident, but used a cane more or less until within three weeks of the trial,

which was in January after the accident,—a little over four months,—and that he had worked since the accident for eight days at carpenter work. Upon a consideration of the whole evidence, the court is of the opinion that the damages are so excessive as to justify the conclusion that they were given under the influence of prejudice, and that for this reason a new trial ought to be granted, unless the plaintiff will consent to a reduction of the damages to $1,250. As to this last conclusion of the court I dissent. In my opinion, the amount of damages was very liberal, but not so excessive as to justify this court in interfering with it.

3. The defendant assigns as error the ruling of the trial court in sustaining a challenge to a juror for cause. The ruling was right on the merits; but, were it otherwise, the ruling is not subject to review. Perry v. Miller, 61 Minn. 412, 63 N. W. 1040.

Error is also assigned to the ruling of the court in permitting the superintendent of the mill in which the accident occurred to be called for cross-examination, under the statute (G. S. 1894, § 5659), which provides that the directors, officers, superintendent, or managing agents of any corporation may be so called. The ruling was correct. The statute is a remedial one, and must be construed with reasonable liberality. To limit it, by construction, to the general officers of the corporation, as claimed by the defendant, would defeat the purpose of the statute; for, as a rule, such general officers have no personal knowledge as to what occurs in the actual work of the corporation. The statute includes any officer, superintendent, or agent having supervision or control of the work or act of the corporation involved in the case, whether his rank be that of a general officer or not.

We find no error in the record, except as to the award of damages.

It is therefore ordered that a new trial be granted, unless the plaintiff shall, within 20 days after the remittitur herein is sent down, file in the district court a stipulation signed by him or his attorney that the verdict may be reduced to $1,250. If he does so, the order appealed from shall stand affirmed, and plaintiff shall be entitled to judgment on the verdict as so reduced.